In the Matter of the Judicial Settlement of the Accounts of JAMES C. DOUBLEDAY and CLARENCE B. PLATNER, as Administrators, etc., of JAMES D. CLYDE, Deceased.
JAMES C. DOUBLEDAY and Another, as Administrators, Appellants; JULIA L. SUTLIFF, Claimant, Respondent.

*(Supreme Court, Appellate Division, Third Department, June 30, 1916.)*

DECEDENT'S ESTATE—CLAIM AGAINST ESTATE FOR BOARD, ETC.—EVIDENCE HELD INSUFFICIENT.

Public policy demands that the estates of deceased persons shall not be raided by persons claiming that which they have never asserted in any manner during the lifetime of the deceased.

The evidence by which a claim against the estate of a decedent for table board, room rent, washing and mending, care and nursing of decedent, cash advanced for necessaries during his last illness, a promissory note and board of two guests was sought to be established, examined, and *held*, not to justify the conclusion that there was any express or implied contract or promise on the part of decedent, who had paid his board up to the week of his death, to pay for the services alleged to have been rendered

KELLOGG, P.J., and HOWARD, J., dissented.

APPEAL by James C. Doubleday and another, as administrators, from a decree of the Surrogate's Court of the county of Otsego, entered in the office of said Surrogate's Court on the 23rd day of November, 1915, upholding and allowing respondent's claim to the extent of $1,334.50, with costs.

S. Mack Smith, for the appellants.

Barnum Brothers (S. W. Barnum of counsel), for the respondent.

WOODWARD, J.— Julia L. Sutliff presented a claim to the estate of James D. Clyde, deceased, for the sum of $3,374.54, with interest on $400 of this amount from January 29, 1912, this claim being based upon eight different items. This claim was duly rejected by the administrators and a stipulation was made that it might be heard on the final accounting. Passing over the matters of practice, the administrators petitioned for the judicial settlement of their account, and an answer, filed in behalf of the claimant, set up that the personal property belonging to the estate was insufficient for the payment of the just demands and charges against the estate, and asked that the administrators be required to mortgage, lease or sell the real estate owned by decedent for the payment of such demands and charges. Upon the trial of the claimant's claim, which as made to the administrators alleged that the deceased was indebted to the claimant for table board at the agreed price of $3.50 per week, the learned surrogate permitted an amendment to the effect that " such table board was worth at the rate of $3.50 per week," thus opening the way around the provisions of section 829 of the Code of Civil Procedure. The trial resulted in an allowance of the claim to the extent of $1,334.50, and a decree directing the administrators to dispose of the real estate for the purpose of discharging this obligation. The

administrators appeal from so much of the decree as allows the sum last above mentioned to the claimant.

The claim, as presented, was; first, table board, January 1, 1897, to April 1, 1904, 378 weeks at the agreed price of $3.50 per week, $1,323; second, table board at agreed price of $3.50 per week and rental and care of room, washing and mending worth $1.50 per week from April 1, 1904, to December 4, 1913, less 7 weeks' absence in 1907, in all 496 weeks, at $5 per week, $2,480; third, extra labor caring for decedent during illness from June 1, 1907, to April 1, 1913, in all seventy months, reasonably worth $10 per month, $700; fourth, care and nursing of decedent night and day during six months of his last illness, reasonably worth $25 per week, 26 weeks, $650; fifth, assisting in care of decedent during eight weeks of his last illness, reasonably worth $10 per week, $80; sixth, cash advanced for necessaries during his last illness, $25.33; seventh, promissory note, $400, and interest from January 29, 1912, interest having been paid by decedent to that date; eighth, board of two guests 10 weeks each and one guest 8 weeks, in all 28 weeks, at $3.50 per week, $98, a total of $5,756:33. On this latter amount the claimant admitted credits amounting to $2,381.79, leaving a balance claimed of $3,374.54.

The learned surrogate held that this claim, in so far as it accrued prior to the 4th day of December, 1907, with the exception of the promissory note, was barred by the Statute of Limitations, so that all of the first item of the claim is eliminated from the controversy, and with it all question as to the justification for the amendment by alleging the value of the board in place of the agreed price. And the same is true of a considerable part of the second item.

It appears from the account submitted by the claimant that beginning with the 12th day of November, 1907, and continuing throughout the balance of his life, Dr. Clyde changed the policy of paying in groceries, taxes, etc., and made cash pay-

ments which appear to aggregate substantially the amount of the board at the agreed price, many of the items being the exact amount of the board for the intervals of time between payments, and it is very evident, from the claimant's own showing, that Dr. Clyde intended to and did pay his board in the agreed amount of three dollars and fifty cents during his lifetime, and the only excuse for making the claim for board was to give some sort of foundation for the testamony as to the other items making up the claim. Starting with the conceded fact that Dr. Clyde had boarded with the claimant's mother and with the claimant for a long term of years; that Dr. Clyde had been in a measure a member of the claimant's family since she was a girl of ten years of age, and it was comparatively easy to get neighbors and relatives to testify in a general way to little acts of courtsey, such as helping Dr. Clyde to put on his coat, assisting him to get up stairs, raising the clothes line to permit him to pass under, with some references to washing, etc., due to his lack of control over his bowels and urinary organs, and to draw the inference that these services were continuous during the periods for which the claim was made, and it is upon this class of evidence that this claim has been approved. With the fact out of the case that Dr. Clyde had been a boarder in the claimant's family for many years, paying his board with comparative regularity, as clearly appears from the evidence supplied by the claimant's own account, there would be no evidence worthy of consideration to support the great bulk of the claim, and the obvious purpose of including all these items in refence to table board was for the purpose of giving a background for these claims which were never asserted during the lifetime of Dr. Clyde. For years, according to the claimant's account, Dr. Clyde had been boarding and rooming with the claimant, and during all of that time he had been making payments which appeared to have covered practically the amount of the board at $3.50 per week, and now his estate is being

charged with $1,334.50, on the theory of an implied promise
to pay for room rent and alleged services, with no evidence
which could support such a conclusion, except as it is woven in
with the admitted fact that the deceased boarded at the
claimant's house. Why he should have religiously paid his
board from away back in 1870 down to the very week of his
death, and yet have permitted his room rent and care taking to
be entirely in arrears is not suggested, and while there is the
testimony of a neighbor that at some time Dr. Clyde occupied
his own house and took his meals at the claimant's, and it
appears that he subsequently occupied a room in the claimant's
house, there is no evidence to show that there was any under-
standing, expressed or implied, that there should be any larger
charge for the board and lodging, or, indeed, that the board and
lodging were not included in the price which Dr. Clyde paid.
The evidence does not show the price paid for table board prior
to Dr. Clyde's occupying the room in the claimant's house, and
while three dollars and fifty cents per week might seem a very
small price for board and lodging, it is to be remembered that
this transaction took place in a small community, and the prices
fixed in 1870 and continued along to the time of the death of
Dr. Clyde, might not have been anything out of the ordinary
course of events in such a community. It is a significant fact
that in the eighth item of this claim, without any dates, the
claimant makes a charge for " two guests ten weeks each and
one guest eight weeks  *  *  *  board at $3.50 per week "
and there is nothing to indicate that these guests did not
occupy rooms in the claimant's house, becoming boarders.
" Board " is defined as " To receive food as a lodger, or without
lodgings, for a compensation " (Pollock v. Landis, 36 Iowa,
651, 652), and " boarder " is defined as " one who has food or
diet and lodging in another's family, for reward; one who has
food and lodging in another's house or family for a stipulated
price." (5 Cyc. 718.) The claimant chose her own language,

MATTER OF DOUBLEDAY AND PLATTNER.    463

and she describes these people as guests, and a "guest," in contemplation of law, is a transient person who resorts to and is received at an inn for the purpose of obtaining the accommodations which it purports to. afford.   (16 Am. & Eng. Ency. of Law [2d ed.], 516, and authorities cited in note.)   The claimant conducted a boarding house and she claims from Dr. Clyde's estate for the board of guests at three dollars and fifty cents per week, and, in the absence of limiting words, we must conclude that her rate for guests was three dollars and fifty cents per week for their entertainment, including lodging. No good reason suggests itself, except that Dr. Clyde is dead and cannot resist the claim, why his estate should be charged for board and lodging more than other guests of the claimant — more than her regular price. It is suggested, of course, that Dr. Clyde had relatives who did nothing for him in his declining years, but he appears to have been a man of some means, abundantly able to take care of himself, and he likewise appears to have discharged his obligations to the claimant regularly so far as there was any substantial foundation for them, and now that he has passed beyond the vale is no reason why the court should undertake to administer abstract justice as between the claimant and the heirs of the deceased.

It may be conceded that the evidence tends to support the claim for board of the deceased at three dollars and fifty cents per week, but it is equally clear from the claimant's admissions in the record that Dr. Clyde paid his board right up to the very week of his death, his administrators satifying the demand for the final week; and the effort to hitch on to this legitimate transaction the claims made for alleged room rent and care is not free from that suspicion which justly attaches to claims extending over a long period of time and which remain unasserted until after the death of the person who is alleged to have incurred the obligation.   There are, undoubtedly, some considerations of natural justice which would have warranted

Dr. Clyde in providing a larger compensation to the claimant; but the record before us does not justify the conclusion that there was any expressed or implied contract or promise on his part to pay for the alleged services which were undoubtedly rendered in the performance of those good offices which a landlady of long years of association with a boarder would be prompted to make in his old age. The authorities are uniformly against the claimant in this matter; public policy demands that the estates of deceased persons shall not be raided by persons claiming that which they have never asserted in any manner during the lifetime of the deceased. (Matter of Dole, 168 App. Div. 253, 255; Kearney v. McKeon, 85 N. Y. 136; Matter of Van Slooten v. Wheeler, 140 id. 624; Porter v. Rhoades, 48 App. Div. 635; Forbes v. Chichester, 30 N. Y. St. Repr. 370.)

The decree, in so far as appealed from, should be reversed.

All concurred, except KELLOGG, P. J., and HOWARD, J., who dissented.

Decree, so far as appealed from, reversed, without costs. The court disapproves of the finding that the deceased obligated himself to pay the items in dispute.